934 So.2d 391 (2005)
Carolyn McGALLAGHER
v.
ESTATE OF Lewis M. DeGEER, Jr., deceased.
2040049.
Court of Civil Appeals of Alabama.
December 30, 2005.
*394 Anna M. Williams of Williams & Armer, LLP, Grand Bay, for appellant.
Jon A. Green of Shields, Ratliff, Green & Kern, Mobile, for appellee.
CRAWLEY, Presiding Judge.
Lewis M. DeGeer, Jr., died testate on June 19, 2001, survived by nine children and four children of a deceased child. On November 6, 2001, the Mobile Probate Court issued letters testamentary to Carolyn McGallagher, DeGeer's daughter, whom he had appointed as the executrix of his estate and as the trustee of a testamentary trust. On November 28, 2001, the probate court authorized McGallagher to disburse to DeGeer's heirs the proceeds of a $400,000 settlement in a wrongful-death lawsuit arising out of DeGeer's exposure to asbestos. Accordingly, McGallagher distributed $40,000 to each of DeGeer's nine surviving children and $10,000 to each of the four children of the predeceased child.
On May 3, 2002, Deborah Marie Barbour, one of DeGeer's daughters, filed a petition to contest the will and a petition to remove McGallagher as the executrix and to appoint an administrator ad colligendum. On September 25, 2002, eight more individualsfour children and four grandchildren of DeGeerwere added as petitioners.
The probate court conducted extensive hearings on the petition to remove McGallagher as the executrixon December 11, 2002, April 3, 2003, and May 15, 2003. The evidence at those hearings tended to show that, before his death, DeGeer owned, either solely or as a joint tenant with the right of survivorship in McGallagher, between 30 and 40 low-income rental properties. After making specific bequests and devises, DeGeer's will provided, in pertinent part:
"Article Four

"All of the rest and residue of my estate I give, devise and bequeath to Carolyn L. McGallagher, as trustee for my children [reciting the names of DeGeer's nine surviving children] and the children of my deceased daughter ..., per stirpes.
"My said trustee shall sell all of my real property at a reasonable appraised value, at such time as she deems appropriate; collect all rents, notes and mortgages as they become due; and generally oversee all of the management of said property; said trustee shall pay herself 15% of the sales price of any property sold for cash, and 15% of the money received as rent or note payments for her services in managing the estate, and shall divide the balance of all of the income of the trust in 10 shares, to be distributed quarterly, per stirpes as follows: [reciting the names of nine children and four grandchildren, the children of a predeceased daughter].
"....

*395 "During the term it requires to reasonably liquidate the trust assets, [the trustee] shall collect the income from the property comprising the trust estate and the proceeds from liquidation thereof, pay all incidental expenses of the trust, and shall distribute the proceeds quarterly....
"Article Five

"I hereby grant to my executrix and to the trustee of the trusts established hereunder, ... the continuing, absolute, discretionary power to deal with any property, real or personal, held in my estate or in the trust, as freely as I might in handling my own affairs.... I hereby grant to my executrix and also to the trustee hereunder, the following specific powers and authority in addition to and not in substitution of powers conferred by law:
"....
"(c).... [T]o lease any real estate for such term or terms and on such conditions and rentals and in such manner as she may deem advisable, and to make repairs, replacements and improvements, structural or otherwise, to any such real estate and to charge the expense thereof to principal or income or apportion the same as she may deem proper...."
The evidence indicated that McGallagher had assisted her father before his death in collecting the rental income from his properties and from properties owned by two other entitiesJoe Landry Rentals and Tide Marine, Inc. ("T-Mar"). McGallagher testified that her father, during his lifetime, had received as the collecting agent for those two entities fees representing 25% of the rents collected for Joe Landry and 15% of the rents collected for T-Mar. McGallagher explained that her father had done maintenance and repairs on his own properties as well as on the T-Mar and Joe Landry properties.
The evidence was undisputed that, after her father's death, McGallagher assumed the duties of maintenance, repair, and rent collection on three separate sets of property: (1) property that she and her father had held as joint tenants that became solely hers by right of survivorship after her father's death; (2) "estate property" that was devised to her in trust for the testator's nine children and four grandchildren; and (3) property that was owned by Joe Landry and T-Mar. Although McGallagher assumed the foregoing duties upon her father's death in June 2001, she did not open a separate estate account or trust account until February 2002. She acknowledged that until February 2002 she had commingled the receipts and disbursements for all three sets of property, but she claimed that she had later reimbursed the estate after she established an estate account. McGallagher testified that she continued her father's practice of retaining a 25% fee for collecting the Joe Landry rentals and a 15% fee for collecting the T-Mar rentals. She said that, at first, she allocated those fees to the estate but that, after February 2002, she began to deal with Joe Landry and T-Mar in an individual capacity rather than as the personal representative of the estate. From that time on, she said, she took "her percent" of the Joe Landry and T-Mar rentals. She also paid herself a 15% commission on all "estate" rentals from June 2001 to February 2002.
McGallagher testified that her husband and her son had performed most of the repair work on all three sets of property. The evidence indicated that the repair expense for the "estate property" for the first 18 months after DeGeer's death was $42,000, a sum that, McGallagher admitted, was so large that the estate realized *396 no profit on rentals for that period. McGallagher acknowledged that she had paid over $7,000 for repairs to a mobile home that was valued at only $2,000. She explained that the annual rent on the mobile home was $3,600more than its sale valueand, she said, she had to make the repairs in order to rent the mobile home.
On July 7, 2003, the court entered an order containing the following findings of fact and conclusions of law:
"5. The records regarding [DeGeer's] business operations during his lifetime are not good.
"6. The records regarding [McGallagher's] administration of [DeGeer's] estate are not good.
"7. The records regarding [McGallagher's] administration of the ... estate suggest that [McGallagher] may have commingled assets of the ... estate with [McGallagher's] asserts.
"8. The testimony presented to the Court suggests that [McGallagher] has paid herself fees and commissions from assets of the ... estate that were not previously submitted to the Court for approval or consented to by all of the interested parties.
"9. The testimony presented to the Court suggests that [McGallagher] may have usurped business opportunities of the ... estate for [McGallagher's] individual benefit.
"....
"13. The Court ... concludes that it would be in the best interest of all ... parties for an independent, court-appointed special master [to] review the business records of the ... estate and report to the Court the special master's findings after said review has been accomplished."
The court appointed a certified public accountant as the special master and specifically requested the special master to determine whether all assets of the estate had been properly accounted for, whether McGallagher had usurped business opportunities of the estate, whether McGallagher had commingled estate assets with assets owned by her or third parties, and whether McGallagher had taken any fees or commissions.
On July 15, 2003, Barbour dismissed the will-contest petition and filed a petition to have the executrix/trustee file an accounting. The special master filed his report on March 29, 2004. That report states, in pertinent part:
"It was very evident that the records and methods of accounting, which were being used by Mr. DeGeer prior to his death, were very poor and not complete in any manner. Mrs. McGallagher continued using the same methods after Mr. DeGeer's death as she had apparently done when she assisted him when necessary prior to his death. This resulted in records that were very difficult if not impossible to follow with little or no distinction between estate receipts and disbursements and those related to the managed properties of other clients and properties owned by Mrs. McGallagher. The commingling of funds in the estate's bank records in the months after Mr. DeGeer's death consisting of receipts and disbursements and the poor systems used to account for these receipts and disbursements made it impractical to do any better job of accounting for these transactions than has already been done by Mrs. McGallagher and her accountant. Though these records are not accurate, the cost of trying to recreate records that are more accurate would undoubtedly exceed any benefit derived assuming it could be done at all.

*397 "This is principally a cash business of low-income rental housing and high-risk sales on vendor's liens to low income individuals. The amount of rental income and note collections actually received is virtually impossible to trace. If any collection is inadvertently not recorded or recorded to the wrong property or note, then there is no practical way to discover whether the funds were received or not. Substantial repair work was performed on the properties in the two plus years since the date of death, much of which was apparently done by [McGallagher's] husband ... and her son. With the lack of contemporaneous records as to which property the repair work was performed on, it is impossible short of some arbitrary ratio of allocating these repairs to the Estate's properties, Mrs. McGallagher's [properties], or the two properties managed by the Estate.
"....
"The bank accounts listed on the attachment are the accounts that I have become aware of during my review. At least one Estate account was opened in [McGallagher's] name, AmSouth account number XXXXXXXX. This is the account through which the $400,000.00 distribution to the beneficiaries was made ....
"Attached is a listing of the payments that I found made to Mrs. McGallagher from date of death through October 20, 2003. Commissions totaling $8,542.33 were paid during 2001 and 2002. Collection fees have been accrued in the amount of $6,690.37 in 2003, but not paid. Other payments made to Mrs. McGallagher other than her pro-rata share of the distributions totaled $27,025.66. Of this amount, $17,172.41 is being accounted for as an asset of the estate in the `cash' section of the balance sheet. It appeared that a portion of this represented transfers between bank accounts, but I was not able to trace the transfer because the deposit amount did not equal the amount of the check drawn.
"As to the possible usurping of any business opportunities related to the managed properties owned by Joe Landry and T-Mar, because of the poor records it was not practical to try and tie down collections, repairs, management fees and payments of net proceeds to the property owners. Again, the cost of the work necessary to separate the activities of these properties, assuming it would be possible to accomplish, would not be beneficial to the estate. I would also recommend a reasonable arbitrary allocation of these transactions based on the records currently available. As to the tower rent, it appears, at least in the beginning that the rent was going into the Estate's bank account as a direct deposit.
"It is important at this point to note that it was apparent in my review that the records of [McGallagher] for the estate did reflect improvement from year to year with adjustments being made each year for the updated information obtained during the preceding year. However, there was no indication that the prior year's records were adjusted for these updates."
On April 21, 2004, the Mobile Probate Court entered a judgment adopting by reference its earlier findings and conclusions, as well as the findings and conclusions of the special master. The judgment states, in pertinent part:
"19. [McGallagher] cannot and should not be held responsible for the manner by which the Decedent conducted his business affairs or how he kept his business records. Nevertheless, [McGallagher] stands in a fiduciary relationship *398 to the Decedent's estate, the Decedent's heirs and creditors. [McGallagher] is responsible for her administration of the Decedent's estate and the management of the Decedent's estate's assets. It should be noted that [McGallagher] had legal counsel available to her to advise as to any aspect of the administration of the Decedent's estate and the management of the Decedent's estate's assets. Further, it is well-settled in Alabama law that [McGallagher] should not have commingled her personal assets with the Decedent's estate's assets.
"20. The Special Master noted that substantial repair work had been performed on properties belonging to the Decedent's estate and [McGallagher] since the Decedent's death. The Special Master noted that most of said work was performed by [McGallagher's] husband and son. The Special Master reported that there were no contemporaneously kept records as to which property the repair work was performed on. Accordingly, the Special Master reported that it was impossible to allocate the repair expenses between the Decedent's estate's properties and [McGallagher's] properties.
"21. Since there are no records to substantiate what repair costs are properly charged to the Decedent's estate, it shall be presumed that none of the repair costs are chargeable to the Estate.
"22. The Court is of the opinion, and therefore concludes, that [McGallagher] shall repay to the Decedent's estate, the amount of any repair costs previously paid by [McGallagher] to any party from the Decedent's estate's assets during the course of the administration of the Decedent's estate.
"23. The Special Master reported that [McGallagher] paid herself `commissions' totaling $8,542.33 in 2001 and 2002 relating to the Decedent's estate's real estate assets. The Special Master reported that additional `commissions' totaling $6,690.37 have accrued for the 2003 calendar year.
"24. Since the Decedent's estate's business records are in shambles and there has been commingling of the Decedent's estate's assets with [McGallagher's] personal assets, [McGallagher] is not entitled to the `commissions' [McGallagher] has paid herself for the 2001 and 2002 calendar years and [McGallagher] is not entitled to receive the `commissions' that accrued for the 2003 year.
"25. The Court is of the opinion, and therefore concludes, that [McGallagher] shall repay to the Decedent's estate, the sum of $8,542.33, which [McGallagher] previously paid herself as `commissions,' and [McGallagher] shall not be allowed the accrued `commissions' of $6,690.37 attributed to 2003.
"26. The Special Master reported that [McGallagher] had paid to herself the total sum of $27,025.66. The Special Master could not properly account for said payments.
"27. Since the Decedent's estate's business records are in shambles and there has been commingling of the Decedent's estate's assets with [McGallagher's] personal assets, [McGallagher] is not entitled to retain the $27,025.66 previously paid to [McGallagher] from the Decedent's estate.
"28. The Court is of the opinion, and therefore concludes, that [McGallagher] shall repay to the Decedent's estate, the sum of $27,025.66, which she previously paid to herself.
"29. The management contract regarding the properties owned by Joe Landry and T-Mar belonged to the Decedent at the time of the Decedent's *399 death. Accordingly, said management contract constituted an asset of the Decedent's estate.
"30. Since the Decedent's estate's business records are in shambles, including but not limited to the records concerning the management, repair and collection of rentals pertaining to the properties owned by Joe Landry and T-Mar, and there has been commingling of the Decedent's estate's assets with [McGallagher's] personal assets, [McGallagher] is not entitled to retain any of the management fees collected by [McGallagher] in her individual capacity and [McGallagher] is not entitled to offset any repair expenses [McGallagher] incurred with regard to said properties.
"31. The Court is of the opinion, and therefore concludes, that [McGallagher] shall account and pay over to the Decedent's estate, all sums collected by [McGallagher] in her individual capacity with regard to the properties owned by Joe Landry and T-Mar, with no offset as to any repair expense [McGallagher] incurred with regard to said properties.
"32. The Special Master could not fully account for the `tower' rental, which appears to be an asset of the Decedent's estate....
"33. Since the Decedent's estate's business records are in shambles and there has been commingling of the Decedent's estate's assets with [McGallagher's] personal assets, [McGallagher] must account for any tower rent received since the initial commencement of the payment of tower rent in the Decedent's estate's bank account.
"34. The Court is of the opinion, and therefore concludes, that [McGallagher] shall account for any tower rent received since the commencement of the Decedent's estate proceeding."
The judgment removed McGallagher as the executrix/trustee and appointed David DeGeer as the successor executor/trustee. The judgment further ordered McGallagher to provide an accounting and a final settlement of her administration of the estate,[1] and it required her to repay the following sums to the estate: $8,542.33 in commissions; $27,025.66 in previous payments to herself from the estate; all sums collected from Joe Landry and T-Mar rental properties, with no offset for repair expenses; all "tower rent"; $677.50, representing one-half of the mediator's fee; and court costs, including the special master's fee of $5,860.
McGallagher filed a postjudgment motion on May 20, 2004, which was denied by operation of law on August 18, 2004.[2] McGallagher timely appealed to the Alabama Supreme Court on September 27, 2004.[3] The supreme court transferred the *400 appeal to this court pursuant to § 12-2-7(6).

I. Grounds for Removal of Executrix

McGallagher contends that the petition to remove her as executrix failed to allege any of the statutory grounds for removal set out in § 43-2-290, Ala.Code 1975. That section provides, among other things, that an executrix may be removed for "[t]he wasting, embezzlement or any other maladministration of the estate," for "using of any of the funds of the estate for [her] own benefit," or "when from [her] conduct or character there is reason to believe that [she] is not a suitable person to have the charge and control of the estate."
The verified petition for removal alleged that McGallagher had "mishandled funds," had "withheld information as to the assets and disbursements of [the] estate from the other rightful heirs despite repeated requests for explanation and review," and had "mismanaged the estate." Those allegations adequately stated statutory grounds for removal. See Thompson v. Case, 843 So.2d 197 (Ala.Civ.App.2002) (holding that decedent's heirs could seek removal of administrator based on allegations of fraud and waste of estate assets).

II. Repayment of "Tower" Rent

McGallagher argues that the "tower" rents are her separate property by virtue of Article II of DeGeer's will and that the probate court erred by requiring her to repay that rental income to the estate. We agree.
In 1987, DeGeer executed a will that, in Article II, devised and bequeathed to McGallagher
"the house and land which is my residence at the time of my death and all of my personal belongings which I may own at the time of my death in said home."
In 2000, DeGeer entered into a lease with Crown Communications, Inc., allowing Crown to erect a wireless-communications tower on a 100-foot square plot in the yard behind DeGeer's residence. During his lifetime, DeGeer received rental income of $450 per month pursuant to this lease.
The devise of DeGeer's "house and land which is my residence at the time of my death" passed to McGallagher a fee simple in the property. See Gadsden Loan & Trust Co. v. Tennessee Coal, Iron & R. Co., 218 Ala. 219, 221, 118 So. 402, 403 (1928) (construing a devise in a will by quoting the rule that "`[e]very estate in lands is to be taken as a fee simple, although the words necessary to create an estate of inheritance are not used, unless it clearly appears that a less estate was intended'").
"Under Alabama law, every grant of an estate in lands is presumed to be in fee simple and all doubts are to be resolved in favor of this presumption. Hacker v. Carlisle, 388 So.2d 947 (Ala. 1980). An intent to create a lesser estate must be expressed in lucid, unambiguous language. Slaten v. Loyd, 282 Ala. 485, 213 So.2d 219 (1968)."
Harrell v. McMeans, 598 So.2d 957, 959 (Ala.Civ.App.1992). Ownership in fee simple includes the right to the income, rents, and profits from the land. See McCall v. Morgan, 244 Ala. 472, 474, 14 So.2d 374, 375 (1943):

*401 "A deed of conveyance passing a present title in fee simple carries the right of immediate possession, use, and enjoyment. In the absence of a reservation in the deed it passes title to rents thereafter accruing under an existing rental contract between the vendor and his tenant in possession. The rent is incident to the estate granted, may be recovered from the tenant without attornment; the law raises a privity between purchaser and tenant, or, as sometimes stated, the covenant to pay rent runs with the land."
The probate court erred by requiring McGallagher to return the tower rentals to the estate.

III. Removal of the Executrix

McGallagher asserts that the probate court erred in determining that she had committed acts warranting her removal as executrix. "[T]he decision whether to remove a person as an executor of an estate is left to the discretion of the trial court. This Court's review on appeal is limited to determining whether the trial court [exceeded the limits of] its discretion. Jones v. McGuirt, 416 So.2d 970 (Ala. 1982)." Sprouse v. Hawk, 574 So.2d 754, 758 (Ala.1990).
"Because the probate court's judgment is based, in part, upon testimony adduced at an ore tenus proceeding, we presume its judgment to be correct, and we will not reverse its judgment unless it is `palpably erroneous.' Cox v. Logan, 262 Ala. 11, 13, 76 So.2d 169, 171 (1954). A more recent statement of the `ore tenus' rule, as applicable in an appeal from a probate court's judgment, appears in Craig v. Perry, 565 So.2d 171, 175 (Ala.1990) (citations omitted):
"`[W]hen a court hears ore tenus evidence in a nonjury case, its ruling based on that evidence is presumed correct and will be overturned only if clearly erroneous or manifestly unjust. Its findings of fact will not be disturbed on appeal if they are supported by the evidence or any reasonable inference therefrom. The presumption of correctness is especially applicable where . . . the evidence was conflicting. The weight to be given the witnesses' testimony [is] for the trial judge, because he had the opportunity to view the witnesses and their demeanor.'"
Barron v. Scroggins, 910 So.2d 780, 782-83 (Ala.Civ.App.2005).
The probate court's finding that McGallagher had commingled receipts and disbursements relating to three different types of real propertythat belonging to her; that belonging to the estate; and that belonging to Joe Landry and T-Maris not clearly erroneous. Commingling of the assets constitutes a breach of duty warranting McGallagher's removal. See Geeslin v. McElhenney, 788 S.W.2d 683 (Tex.App.1990)(holding that commingling estate funds with those of a pension plan created by the testator for his widow's benefit warranted removal of executor).
"The principle is well established that the use by the executor of the money of the estate is a breach of duty rendering him liable for interest, and, if he received interest, he must account for it, because he could not be permitted to derive individual profit from the funds in his possession."
First Nat'l Bank of Opp v. Weaver, 225 Ala. 160, 162, 142 So. 420, 421 (1932). See also Collins v. Clements, 199 Ala. 618, 619, 75 So. 165, 165 (1917):
"The [executor] admitted, as a witness, that he deposited certain funds, belonging to the estate, in the bank to his individual credit, and that he drew upon same for his own use on different *402 occasions. This was such a conversion and commingling of funds as to render him liable to account for the interest on same during the period of conversion and the trial court erred in not charging him with interest on the fund[s] kept by him in the bank to his individual credit."
The probate court did not exceed the limits of its discretion in removing McGallagher as the executrix.

IV. Repayment of Repair Expenses and Commissions on "Estate Property"

McGallagher maintains that the probate court's order requiring her to repay to the estate the rental-property repair expenses and the commissions that, she says, she earned for collecting the rents on estate properties was erroneous.
As to the repair expenses, the special master's report indicated (and evidence presented by McGallagher tended to show) that McGallagher had kept no contemporaneous records as to which of three sets of properties the repairs related. McGallagher's accountant testified that, relying solely on McGallagher's after-the-fact allocation of repair expenses to specific rental units, he had attempted to determine the repair expense for the estate properties. Under the circumstances, we do not consider the trial court's ordering McGallagher to repay the amount she claimed as repair expensesthus insuring that the status quo would be maintained until the final settlementto be erroneous.
We also find no error in the probate court's order requiring McGallagher to repay the commissions that, she says, she earned on the rental income from the estate properties. Compensation to executors and administrators should be refused only in cases of fraud, willful default, or gross negligence, causing loss to the estate. Webb v. Webb, 250 Ala. 194, 33 So.2d 909 (1948). We assume that the repayment order was aimed at maintaining the status quo until the final settlement, at which time the probate court may be persuaded, by more accurate accounts, that McGallagher is entitled to some or all of the commissions she says are due her under the terms of DeGeer's will. The will appears to contemplate that, until such time as the trustee effectuates a sale of DeGeer's rental properties, the trustee will collect the rents on the properties, pay herself a 15% commission from the rental income, and make a quarterly distribution of the rental income to the trust beneficiaries. The evidence was undisputed that McGallagher paid herself commissions but made no income distributions to the trust beneficiaries.
"[The] reason for compensation is to repay a personal representative for trouble, risk, and the responsibility involved, and to reward him for the fidelity with which he discharges his trust. If the representative is unfaithful . . . and fails in his fidelity . . . he forfeits the right to compensation. Compensation is due to him who serves, not to him who destroys."
Webb v. Webb, 250 Ala. at 214, 33 So.2d at 926.
Based on McGallagher's admitted commingling of receipts and disbursements from all three sets of properties (the estate properties, the Joe Landry and T-Mar properties, and McGallagher's separate properties), the probate court acted within its discretion in requiring McGallagher to repay the commissions she claimed.
"As a rule, where the personal representative unlawfully converts or misappropriates the funds or other assets of the estate, or commingles estate funds with his own to the detriment of the estate, he will be denied compensation; but this rule is not arbitrarily applied, and, notwithstanding the misapplication *403 or commingling of funds of the estate, compensation has been allowed in cases where no fraud or bad faith on the part of the personal representative was shown, or where it appeared that on the whole the estate derived benefit from his services. It has also been held proper to refuse commissions on funds which have been commingled but to allow compensation for services as to other property."
34 C.J.S. Executors and Administrators § 876 at 1049 (1942) (footnotes omitted). See McCollum v. McCollum, 218 Ala. 500, 503, 119 So. 232, 235 (1928)(affirming the disallowance of compensation to an executor/trustee because accounts were commingled and the "failure to keep any record or memorandum . . . rendered a proper accounting most difficult"). Cf. Webb v. Webb, 250 Ala. at 215, 33 So.2d at 927 (in affirming the denial of attorney fees to a personal representative, the court stated, "If [the personal representative] had kept proper books and records and had accounted for the funds of the estate which came into his hands in his fiduciary capacity, the preparation of the report for final settlement would have been a comparatively simple matter and this litigation would have been avoided." The court further stated, "We do not question the fact that counsel representing the [personal representative] have expended considerable time and effort in preparing the report for final settlement in addition to their services in connection with the defense of that report. But again we call attention to the fact that it was the dereliction on the part of [the personal representative] which made that necessary.").

V. Repayment of Sums Collected from the Joe Landry and T-Mar Rental Properties

McGallagher insists that the probate court erred by ordering her to repay all sums collected from the Joe Landry and T-Mar rental properties, with no offset for repair expenses. She argues that, if Joe Landry and T-Mar do not dispute the repair costs, the estate has no reason to object. This argument presupposes that the Joe Landry and T-Mar rental income is not part of the estate, a presupposition that we conclude is erroneous.
The issue is whether DeGeer's contracts with Joe Landry and T-Mar survived his death. The general rule is stated in Cates v. Cates, 268 Ala. 6, 104 So.2d 756 (1958):
"Contracts resting on the skill, taste, or science of a party, i.e., those contracts wherein personal performance by the promisor is of the essence and the duty imposed can not be done as well by others as by the promisor himself, are personal and do not survive his death."
268 Ala. at 10, 104 So.2d at 759. A contract that is not one for personal services survives the death of the decedent; the decedent's personal representative has the right to carry out and enforce the contract or to sell it as an asset of the decedent's business. Id. In Cates, the court held that a decedent's contracts to haul milk from one point to anothercontracts that were performed during the decedent's lifetime by truck-driver employees of the decedentwere not personal-services contracts, were not terminated by decedent's death, and were capable of being carried out by decedent's personal representative. See also Jones v. Anderson, 82 Ala. 302, 2 So. 911 (1887) (stating that a contract to deliver timber was not purely personal).
There is nothing in the record to indicate whether the principals of Joe Landry and T-Mar relied on the particular "skill, taste, or science" of DeGeer when those entities contracted with DeGeer to maintain, repair, and collect the rents on *404 their leased properties. However, we need not decide whether DeGeer's contracts with Joe Landry and T-Mar were personal-service contracts that terminated with DeGeer's death because, even if the contracts were personal-service contracts that would otherwise have terminated with DeGeer's death, the undisputed facts in the record before us indicate that Joe Landry and T-Mar waived the terminable-at-death feature of their contracts with De-Geer.
"[E]ven though the contract is one which would terminate at the promisee's death, the promisor may waive this feature of the contract and does so where he permits others, associated with the promisee in his lifetime in rendering the performance, to continue after his death and accepts such performance without giving notice within a reasonable time of an intention to consider the obligation as ended."
94 C.J.S. Wills § 117d. at 879 (1956) (footnote omitted). Cf. Rape v. Lyerly, 287 N.C. 601, 215 S.E.2d 737 (1975)(holding that, although a daughter's promise to care for her father during his lifetime in exchange for his promise to devise property to her was a contract for personal services that would ordinarily terminate at the daughter's death, the father waived this feature of the contract by permitting his son-in-law and grandchildren to continue the daughter's services without notifying them that he considered his contract with the daughter to have terminated).
In the present case, there was evidence from which the probate court could have concluded that Joe Landry and T-Mar, by permitting McGallagher (who had assisted DeGeer during his lifetime in collecting the Joe Landry and T-Mar rentals) to continue those actions after DeGeer's death and by accepting McGallagher's performance of DeGeer's contractual obligations without giving notice within a reasonable time of an intention to consider DeGeer's obligations as ended, waived the terminability feature of their contracts with DeGeer.
As DeGeer's executrix, McGallagher had the right to carry out those contracts, subject to the following principles:
"The personal representative may . . . continue the business of the decedent so far as is necessary to carry out the executory non-personal contracts of the decedent. And where a personal representative does in fact perform the contract of the decedent, the estate will be entitled to any profit realized in consequence.

"It is also well settled that when a personal representative carries on the trade or business of the decedent, he is chargeable with the use of the property and capital with interest or the profits made in carrying on the business.
"Where the personal representative converts the business of the decedent, he is chargeable with the value of the business and the profits made during the period of conversion."
Cates v. Cates, 268 Ala. at 9-10, 104 So.2d at 759 (emphasis added; citations omitted).
Based on the foregoing authorities, we hold that the probate court did not err by ordering McGallagher to repay all sums collected from the Joe Landry and T-Mar rental properties, with no offset for repair expenses.

VI. Payment of Court Costs

McGallagher asserts that the court erred by ordering her to pay one-half of the mediator's fee and all of the court costs, including the special master's fee.
With respect to payment of the mediator's fee, McGallagher argues that Barbour and the copetitioners should be *405 solely responsible because, she says, it was they who caused mediation to fail. The record does not disclose the reasons why mediation was unsuccessful. The record does disclose that both parties consented to mediation. Rule 2 of the Alabama Civil Court Mediation Rules states, in pertinent part:
"Parties to a civil action may engage in mediation by mutual consent at any time. The court in which an action is pending shall order mediation when one or more parties request mediation or it may order mediation upon its own motion. In all instances except where the request for mediation is made by only one party, the court may allocate the costs of mediation, except attorney fees, among the parties. In cases in which only one party requests mediation, the party requesting mediation shall pay the costs of mediation, except attorney fees, unless the parties agree otherwise."
(Emphasis added.) We find no error in the court's allocating the costs of mediation.
McGallagher claims that the court costs, including the special master's fee, should have been taxed against the estate pursuant to § 43-8-196, Ala.Code 1975. That section provides for the taxing of costs in a will contest. The will contest was dismissed, however, and this case proceeded as one for removal of the executrix. Thus, the applicable statutory provision is § 43-2-297, Ala.Code 1975, contained within the article relating to removal of executors and administrators. That section provides:
"If the application [for removal] is determined against the applicant, he, otherwise the executor or administrator, must be taxed with the costs, for which execution may be issued."
Rule 53(a), Ala. R. Civ. P., states that
"[t]he compensation to be allowed to a master shall be fixed by the court, and shall be charged upon such of the parties or paid out of any fund or subject matter of the action, which is in the custody and control of the court as the court may direct."
Based upon § 43-2-297 and Rule 53, we conclude that the court's taxing costs to McGallagher was appropriate.

VII. Conclusion

That portion of the judgment of the Mobile Probate Court removing McGallagher as executrix/trustee and ordering her to repay all repair expenses, $8,542.33 in commissions, and $27,025.66 in previous payments to herself from the estate, is affirmed. That portion of the judgment ordering McGallagher to repay all sums collected from the Joe Landry and T-Mar rental properties, with no offset for repair expenses is also affirmed. In addition, that portion of the judgment ordering McGallagher to pay $677.50, representing one-half of the mediator's fee, and court costs, including the special master's fee of $5,860, is affirmed. Finally, that portion of the judgment ordering McGallagher to repay the "tower" rent is reversed and a judgment is rendered for McGallagher.
AFFIRMED IN PART; REVERSED AND JUDGMENT RENDERED IN PART.
THOMPSON, PITTMAN, and BRYAN, JJ., concur.
MURDOCK, J., concurs in part, concurs in the result in part, and dissents in part, with writing.
MURDOCK, Judge, concurring in part, concurring in the result in part, and dissenting in part.
I respectfully dissent with respect to Part V of the main opinion. I disagree with *406 the conclusion that the Joe Landry and T-Mar rental income is part of the estate. Instead, I am clear to the conclusion that DeGeer's contracts with Joe Landry and T-Mar were personal-services contracts. Landry and T-Mar contracted with DeGeer to manage their rental property in reliance upon his skill in doing so. Those contracts were not in the nature, for example, of a contract to purchase a parcel of land, which, in the event of death by the seller, clearly could be performed on behalf of the seller by his personal representative. To conclude otherwise, as does the main opinion, would essentially force Joe Landry and T-Mar to accept as the manager of their rental properties someone whom they had not chosen or contracted with for that service.
As the main opinion states, Joe Landry and T-Mar could have, and did, waive the terminable-at-death feature of their contracts with the decedent. The very fact that they had the ability to waive this feature is consistent only with a conclusion that those contracts were not owned by the estate, but were in fact personal-services contracts. Had they not been personal-services contracts, there would have been no terminable-at-death feature for Joe Landry and T-Mar to "waive."
Thus, it was not McGallagher as executrix who had some right or obligation to continue performing those contracts on behalf of the estate; it was McGallagher as McGallagher, i.e., in her individual capacity, whom Joe Landry and T-Mar chose to have continue managing their properties after DeGeer's death.
In all other respects, I concur in the main opinion, except as to Part IV of the main opinion as to which I concur in the result.
NOTES
[1] Although the accounting and final-settlement issues had not yet been resolved when McGallagher appealed, and the order removing her as executrix might otherwise be considered interlocutory, a judgment removing an executor or administrator is expressly made appealable by statute. See § 12-22-21(3), Ala.Code 1975. See generally V. Woerner, Right of Appeal from Order on Application for Removal of Personal Representative, Guardian, or Trustee, Annot., 37 A.L.R.2d 751 (1954).
[2] Rules 59, 59.1, and 60 of the Alabama Rules of Civil Procedure apply in probate court proceedings pursuant to § 12-13-12, Ala.Code 1975. See Reneke v. Reneke, 897 So.2d 1101, 1106 (Ala.Civ.App.2003); and In re Morrison, 388 So.2d 1014, 1015 (Ala.Civ.App.1980).
[3] Section 12-22-21, Ala.Code 1975, provides, in pertinent part:

"Appeal from the order, judgment or decree of the probate court may be taken by the party aggrieved to the circuit court or Supreme Court in the cases hereinafter specified. Appeals to the Supreme Court shall be governed by the Alabama Rules of Appellate Procedure, including the time for taking an appeal. Appeal to the circuit court in such cases shall be within the time hereinafter specified:
"....
"(3) Upon any decree, judgment, or order removing an executor or administrator, in which case the appeal must be taken with seven days after such decree, judgment or order."